# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STEPHANIE GALINDO and DAVID WALSH, Individually and For All Others Similarly Situated, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 2021-0031-SG |
| DAVID L. STOVER, JEFFREY L. BERENSON, JAMES E. CRADDOCK, BARBARA J. DUGANIER, THOMAS J. EDELMAN, HOLLI C. LADHANI, SCOTT D. URBAN, WILLIAM T. VAN KLEEF, and MARTHA B. WYRSCH, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: November 2, 2021
Date Decided: January 26, 2022

Blake A. Bennett, of COOCH AND TAYLOR, P.A., Wilmington, Delaware; OF COUNSEL: Juan E. Monteverde, of MONTEVERDE & ASSOCIATES PC, New York, New York, *Attorneys for Plaintiffs Stephanie Galindo and David Walsh.*

Kenneth J. Nachbar and Alexandra M. Cumings, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: Robert S. Harrell, Charles S. Kelley, Joseph De Simone, and Michael Rayfield, of MAYER BROWN LLP, New York, New York, *Attorneys for Defendants David L. Stover, Jeffrey L. Berenson, James E. Craddock, Barbara J. Duganier, Thomas J. Edelman, Holli C. Ladhani, Scott D. Urban, William T. Van Kleef, and Martha B. Wyrsch.*

**GLASSCOCK, Vice Chancellor**

This matter is a damages action by former stockholders of Noble Energy, Inc. ("Noble") resulting from a stock-for-stock merger (the "Merger") with Chevron Corporation ("Chevron") in late 2020. The Defendants were directors and officers of Noble at that time. They have moved to dismiss, pointing out that the Merger was approved by a majority of the Noble stockholders, and that, as a result, they are entitled to application of the business judgment rule, resulting in dismissal of the action for failure to state a claim under Rule 12(b)(6).

Since this Merger does not involve a conflicted controller, approval by the majority cleanses any breach of duty, if—only if—the approval was informed and uncoerced.[1] Coercion is not alleged here; the Plaintiffs, however, allege the vote was not fully informed, precluding the application of the *Corwin*[2] cleansing doctrine. They posit two ways in which the applicable proxy was insufficient.

First, the Plaintiffs point out that the proxy did not disclose an over-the-transom proposal to acquire certain company assets, made two years before the Merger. In light of the facts that Noble never responded to that proposal, that the proposal did not contemplate a merger, and that the proposal was remote in time and

---

[1] Assuming the complaint does not also contain a viable claim for waste. Our caselaw makes this exception clear. I note that corporate waste, disclosed to stockholders and nonetheless (ineffectively) ratified by majority vote, like the sasquatch, is a beast more theoretical than manifest.

[2] *Corwin v. KKR Fin. Holdings, LLC*, 125 A.3d 304 (Del. 2015).

circumstances to the Merger which the stockholders were asked to approve, I conclude the proposal was not material. It was not required to be disclosed to invoke *Corwin*, therefore.

Next, the Plaintiffs point to the fact that, at the beginning of the novel coronavirus crisis (the "COVID-19 pandemic"), the Noble officers took a cut in salary, and that the board of directors of Noble (the "Board") subsequently amended a company severance plan to provide those officers with change-in-control benefits that reflected their pre-COVID-19-pandemic, pre-reduction salaries. While the timing and rationale for the Board action were not themselves disclosed, the amended severance plan was, and the precise payments that named executive officers would receive if the stockholders approved the Merger were set forth in the definitive merger proxy. In light of the mix of circumstances here, I conclude that the timing and rationale for the payments was not material.

Accordingly, the transaction was approved by a majority of the stock voting in an informed, uncoerced manner. I conclude that business judgment applies and the motion to dismiss must be granted.

My reasoning follows a recitation of the facts, below.

## I. BACKGROUND

Noble, an oil and gas exploration and production company, merged with Chevron in October 2020, after the emergence of the COVID-19 pandemic. The

2

Plaintiffs in this action received information from a "confidential informant" regarding an alternative proposal to acquire assets of Noble made in mid-2018. Because this information, and certain other information regarding executive change-of-control payments, is not disclosed in the definitive merger proxy Noble filed prior to the closing of the Merger, the Plaintiffs contend that the stockholder vote approving the Merger was not fully informed. The Plaintiffs additionally challenge the Merger on the basis that the price was unfair, the process was unfair, and that Noble management was conflicted in ignoring transaction opportunities that would not have paid out change-of-control benefits to executives. Their theory is that a change-of-control transaction was preferred so that executives could recoup losses experienced in the stock market as a result of the COVID-19 pandemic's effects on Noble's stock price.[3]

The Defendants bring a Motion to Dismiss for failure to state a claim with respect to each count of the Plaintiff's complaint (the "Complaint"). For the reasons set forth in this Memorandum Opinion, I agree with the Defendants that any breaches of fiduciary duty inherent in this transaction were cleansed by an informed and uncoerced vote of the stockholders. Accordingly, the business judgment rule

---

[3] *See* Tr. of 11.2.21 Oral Arg. on Defs.' Mot. to Dismiss, 35:9–14, Dkt. No. 23 [hereinafter "Oral Arg."] (specifying that the Plaintiffs' theory is not that Noble *engineered* a sale of the entire company to obtain change-of-control benefits, but that it "ignored other transactions that were the same or more beneficial to shareholders" because of the lack of change-of-control benefits).

applies, and I grant the motion to dismiss the action in its entirety without examining whether the Complaint otherwise states a claim for breach of fiduciary duty. Facts informing my conclusions follow.

### A. Factual Overview[4]

#### 1. The Parties and Relevant Non-Parties

The Plaintiffs in this action are David Walsh and Stephanie Galindo, each of whom was a Noble stockholder at all relevant times.[5]

Noble, while not a party to this action, is the Delaware corporation at issue.[6] Noble is now a subsidiary of Chevron, another non-party Delaware corporation, following the Merger, which closed in October 2020.[7]

The Defendants in this action composed the Board of Noble at the pertinent times: David L. Stover, a director, the Board chairman, and also the chief executive officer ("CEO") of Noble; Scott D. Urban, a director and also the Lead Independent Director of Noble as of April 2019; and Jeffrey L. Berenson, James E. Craddock,

---

[4] Unless otherwise specified, the facts in this section are drawn from the Complaint. Verified Class Action Compl. for Breach of Fiduciary Duties, Dkt. No. 1 [hereinafter "Compl."]. To the extent there are any factual discrepancies between the Complaint and other pertinent materials, such as the definitive merger proxy, this section is reflective of the Complaint, and I consider the facts to be true as pled in the Complaint, in accordance with the applicable standard on a motion to dismiss. This section therefore does not constitute formal findings of fact.

[5] *Id.* ¶¶ 8–9.

[6] *Id.* ¶ 20.

[7] *See id.* ¶¶ 2, 21.

Barbara J. Duganier, Thomas J. Edelman, Holli C. Ladhani, William T. Van Kleef, and Martha B. Wyrsch, each a director of Noble.[8]

Cynergy Capital, Ltd ("Cynergy") is a non-party global investment company based in Cyprus.[9]

Prior to the Merger, Noble was an oil and gas exploration and production company with operations in the United States, Africa, and the Eastern Mediterranean markets.[10] Noble announced the discovery of certain fields of natural gas from 2009 to 2011, including the Leviathan field in the Eastern Mediterranean market.[11] Noble ultimately achieved commercial production of the Leviathan field on December 31, 2019.[12]

### 2. The 2018 Cynergy Slide Deck

According to the Complaint, in "mid-2018," Cynergy sent a slide deck to Noble to communicate its interest in acquiring Noble's Eastern Mediterranean assets.[13] Notably, the slide deck became available to the Plaintiffs only thanks to a confidential informant (the "Informant").[14] If the proposal it suggests were to have

---

[8] *Id.* ¶¶ 10–19.
[9] *Id.* ¶ 23.
[10] *Id.* ¶ 2.
[11] *Id.* ¶ 34. The Complaint indicates that Noble had a 39.66% "working interest" in the Leviathan field. *Id.* ¶ 36.
[12] *Id.* ¶ 35.
[13] *Id.* ¶¶ 37–38. The Complaint specifies that Cynergy "contacted Defendant Stover" regarding its interest. *Id.* ¶ 37.
[14] *Id.* ¶ 4. The slide deck has not been made available in its entirety to the Court, but certain slides are extracted and included in the Complaint and Answering Brief.

been consummated, the slide deck indicates that Noble would have realized approximately $1.0 billion cash upon closing of the acquisition.[15] Further, the Informant indicated that Cynergy's interest could have solidified into "up to" $6 billion in consideration for certain of the Eastern Mediterranean assets.[16] The slide deck communicated an interest in an asset purchase solely, rather than a change-of-control transaction.[17]

Noble never executed an NDA, as requested by the slides, or communicated any interest in executing an NDA to Cynergy.[18] The Complaint alleges that Noble's Board "fail[ed] to follow-up on the [Cynergy] Proposal or entertain discussions with Cynergy,"[19] but also questions whether the Board was even informed of Cynergy's proposal.[20]

The Cynergy proposal was never communicated to Noble stockholders.[21]

### 3. The 2019–2020 Sale Process and Chevron Merger

In fall 2019, Noble decided to explore a sale of certain of its Eastern Mediterranean assets and reached out to various counterparties (including Chevron)

---

[15] *Id.* ¶ 38.
[16] *Id.* ¶ 5.
[17] *Id.* ¶ 40.
[18] *Id.* ¶ 41.
[19] *Id.* ¶ 83.
[20] *Id.* ¶ 65.
[21] *See id.* ¶ 6.

to gauge interest.[22]  Three main counterparties emerged: Chevron, Company A, and Company B.[23]  Each of these counterparties spoke with representatives of Noble's management, including Defendant Stover (Noble's CEO) and certain other Noble vice presidents.[24]

On December 11 and 12, 2019, the Noble Board met, and Defendant Stover informed the Board of management's discussions with Company A and Company B, but not Chevron.[25]  At that time, the Board directed Defendant Stover to continue discussions with Company A, but not Company B.[26]

As noted above, on December 31, 2019, Noble announced the commercialization of the Leviathan natural gas field, a significant milestone for Noble as a company.[27]  The Complaint alleges that "[w]ithin a few days" of the commercialization of the Leviathan field, Chevron and Noble engaged in discussions again, particularly with respect to the sale of the Eastern Mediterranean assets.[28]

---

[22] *Id.* ¶ 43.  It is not pled whether Noble reached out to Cynergy to see whether its mid-2018 offer was still on the table at any point.  *See generally* Compl.
[23] Compl. ¶ 43.
[24] *Id.*
[25] *Id.* ¶ 45.
[26] *Id.*
[27] *Id.* ¶ 46.
[28] *Id.* ¶ 47.

In January 2020, Company A withdrew its interest in Noble.[29] A subsequent meeting of the Noble Board reiterated the conclusion, initially reached in July 2019, that to remain competitive and to increase "value, stability, and diversification," Noble would need to become a consolidator or to be sold to a larger company.[30]

In March 2020, the COVID-19 pandemic became a worldwide concern, and Noble's stock price declined precipitously along with the broader stock market.[31] As a result, management's stock holdings and options suffered.[32] The Complaint alleges that the Board began holding special meetings to monitor Noble's stock price.[33] In April 2020, Noble announced reductions in senior leadership salaries of ten to twenty percent.[34] On April 27, 2020, Noble amended its 2016 Change of Control Severance Plan for Executives (the "Amended Plan"), providing that any severance awards for executives were to be calculated based on compensation prior to the pandemic-related reductions.[35] This change was not outlined in the Noble annual proxy statement, but the Amended Plan was attached to Noble's first quarter public Form 10-Q filing (the "Form 10-Q").[36]

---

[29] *Id.* ¶ 48.
[30] *Id.*
[31] *Id.* ¶ 50.
[32] *Id.*
[33] *Id.* ¶ 53.
[34] *Id.* ¶ 51.
[35] *See, e.g., id.* ¶¶ 55, 56.
[36] *Id.* ¶ 56. I note that the annual stockholder meeting for Noble was scheduled for April 28, 2020. *Id.*

At the same time, Noble management's discussions with Chevron continued.[37] From February to April 2020, at least four meetings occurred between Chevron and Noble management, allegedly without the Noble Board's knowledge.[38] On April 27, 2020, the same day the amendment to the severance plan occurred, the Noble Board was informed of management's discussions with Chevron.[39] The Board determined not to pursue a sale of fifty to one hundred percent of Noble's Eastern Mediterranean "position" (at that time the focus of the Chevron discussions), but established an "Advisory Group" to explore additional strategic options.[40] Per the Complaint, the strategic options identified at the Board meeting did not "specifically" include a total company sale.[41]

On May 12, 2020, Noble's President and Chief Operating Officer, Brent Smolik, informed Chevron that Noble would be "willing to entertain a serious offer to acquire the company."[42] On July 20, 2020, Chevron and Noble announced the Merger.[43]

The Merger provided consideration to stockholders of 0.1191 of a share of Chevron common stock in exchange for each one share of Noble common stock.[44]

---

[37] Id. ¶ 53.
[38] Id.
[39] Id. ¶ 58.
[40] Id.
[41] See id.
[42] Id. ¶ 59.
[43] Id. ¶ 60.
[44] Id. ¶ 3.

9

Per the Complaint, this was equal to a value of approximately $10.39 per share the day before the signing of the transaction documents.[45] In total, this was a valuation of $5 billion for the entirety of Noble.[46] The Merger documentation also contemplated a $40 million "integration pool" for executives.[47]

In support of the Merger, the Defendants authorized the filing of a definitive proxy statement (the "Merger Proxy") on August 26, 2020, which the Plaintiffs characterize as "materially incomplete and misleading."[48] The Cynergy proposal was not disclosed in the Merger Proxy, nor were any other proposals predating July 2019.[49] The Plaintiffs contend this omission was material.[50] Obviously, the company's reasons for not pursuing the Cynergy proposal were not included in the Merger Proxy, either, a fact about which the Plaintiffs also complain.[51] Additionally, the Plaintiffs complain of the lack of disclosure regarding the "changes" to the Amended Plan, questioning the timing of the amendment and the role, if any, it played in negotiating the Merger.[52] They suggest that via the Amended Plan,

---

[45] *Id.*
[46] *Id.* ¶ 81.
[47] *Id.* ¶ 59.
[48] *Id.* ¶ 6.
[49] *Id.* ¶ 83.
[50] *Id.* ¶ 82.
[51] *See id.* ¶ 6. I note also that the Complaint raises lack of disclosure regarding the Advisory Group formed at the April 27, 2020 Board meeting, but the Complaint does not allege that this represents a material breach. *See id.* ¶ 65; *see also id.* ¶ 96. As such, I do not consider this part of the claims to be assessed and do not consider the question further.
[52] *Id.* ¶ 84.

management engaged in self-dealing, and that the Board supported this conduct by enacting the Amended Plan.[53]

The Merger Proxy sought, among other things, Noble stockholders' approval of the Merger.[54] It also requested an advisory vote of stockholders in favor of the executive compensation to be paid in connection with the Merger, consistent with the Amended Plan.[55] Noble's stockholders approved both on October 2, 2020.[56]

*B. Procedural History*

The Plaintiffs filed their Complaint, styling the action a class action on behalf of all other holders of Noble common stock harmed by the Defendants' actions, on January 12, 2021.[57] The Plaintiffs bring three total direct[58] claims: (1) breach of "fiduciary duties" against the Defendants (which duties is not specified); (2) breach of fiduciary "duties of disclosure" against the Defendants; and (3) breach of fiduciary duty of care against Defendant Stover alone.[59] The Complaint includes

---

[53] *Id.* ¶ 65.

[54] *See* Transmittal Decl. of Kenneth J. Nachbar Pursuant to 10 *Del. C.* § 3927 in Supp. of Defs.' Mot. to Dismiss Pls.' Verified Class Action Compl., Dkt. No. 7, Ex. 1, at 3 [Ex. 1 hereinafter "Merger Proxy"].

[55] *See id.*

[56] Compl. ¶ 61.

[57] *See generally* Compl.; *see also id.* ¶ 30.

[58] While the Complaint is unclear with respect to whether the claims were direct or derivative in nature, the Plaintiffs identified in their Answering Brief that the claims are direct. *See* Br. in Opp'n to Mot. to Dismiss the Verified Class Action Compl. 43, Dkt. No. 13 [hereinafter "AB"].

[59] Compl. ¶¶ 88–103. At oral argument and in their Answering Brief, the Plaintiffs' counsel also suggested that there may have been fraud on the board. *See* AB 16–17; Oral Arg. 28:10–11. This was not alleged in the Complaint, so I do not consider it an appropriate cause of action to be addressed here.

11

language regarding both an unfair process and an unfair price, and alleges (though not in a specific count) that the Board owed stockholders a "duty of care, loyalty, good faith, candor, and independence."[60]

The Defendants filed their Motion to Dismiss on April 30, 2021.[61]  Briefing followed, and I heard oral argument on November 2, 2021.[62]

## II. ANALYSIS

This motion to dismiss comes before me under Rule 12(b)(6).  The applicable legal standard requires dismissal of the Complaint in the event the Plaintiffs cannot recover under any "reasonably conceivable set of circumstances susceptible of proof."[63]  In assessing the facts, all well-pled factual allegations are to be accepted as true, and the Court must draw all reasonable inferences in favor of the non-moving party, here the Plaintiffs.[64]

---

[60] *See generally* Compl.; *see also id.* ¶¶ 1, 24.  I note that under Delaware's jurisprudence, there are only two fiduciary duties, care and loyalty.  Actions taken or foregone by fiduciaries may implicate one or both of those duties.

[61] Defs.' Mot. to Dismiss Verified Class Action Compl., Dkt. No. 5.

[62] *See generally* Oral Arg.

[63] *In re GGP, Inc. S'holder Litig.*, 2021 WL 2102326, at *11 (Del. Ch. May 25, 2021) (internal quotations omitted).

[64] *See id.*

## A. *The Board's Alleged Breach of Fiduciary Duties*

The Complaint's Count I does not specify which fiduciary duties the Board has, in the Plaintiffs' view, breached. To my mind, each of the Counts pled in the Complaint can be resolved by undertaking a *Corwin* analysis.[65]

*Corwin* stands for the general proposition that where a transaction has been approved by a fully informed, uncoerced majority of disinterested stockholders, the business judgment rule applies.[66] This Court will not, in such a situation, second-guess the judgment of the stockholders. Put another way, the agency problems that support judicial review of the actions of fiduciaries are alleviated where the principals—the stockholders—have the opportunity to, and have, approved the transaction.

For *Corwin* to be applied, the stockholder approval in question must not have been coerced.[67] Such coercion is presumptively present where a "looming conflicted controller" engages in a conflicted transaction.[68] Those transactions subject to entire fairness *involving a controlling stockholder* are excluded from cleansing under *Corwin*.[69] That is, "[c]oercion is deemed inherently present in controlling

---

[65] *See generally Corwin*, 125 A.3d 304.

[66] *Id.* at 305–06.

[67] *See generally id.* at 306 (holding doctrine applicable where entire fairness not the standard).

[68] *See Larkin v. Shah*, 2016 WL 4485447, at *13, *8 (Del. Ch. Aug. 25, 2016).

[69] *Id.* at *8; *see also Firefighters' Pension Sys. of City of Kansas City, Missouri Trust v. Presidio, Inc.*, 251 A.3d 212, 254 (Del. Ch. 2021) (citation omitted) ("But despite this phrasing, *Corwin* precludes cleansing only when entire fairness applies *ab initio* because of the presence of a

13

stockholder transactions of both the one-sided and two-sided variety, but not in transactions where the concerns justifying some form of heightened scrutiny derive solely from board-level conflicts or lapses of due care."[70] Thus, if a plaintiff does not plead a conflicted controller engaging in the transaction, allegations of breach of a duty of loyalty will not preclude the application of *Corwin*, and (presuming the doctrine is otherwise satisfied) will be adjudged to have been cleansed such that the business judgment rule applies.[71]

I make this point to address certain allegations made by the Plaintiffs, and to explain why I do not entertain them in further detail here. Although not expressly pled in response to a *Corwin* argument, the Plaintiffs assert certain facts regarding the change-of-control payments to be made under the Amended Plan, suggesting that Noble management engaged in self-dealing and that the Noble Board either turned a blind eye or "acquiesced and supported management's misconduct."[72] Without passing on the sufficiency of these allegations, precedent indicates that these facts do not prevent the application of the *Corwin* doctrine here. It is not pled that there is any conflicted controller associated with the Merger (indeed, the Plaintiffs do not

---

conflicted controlling stockholder."); *Kihm v. Mott*, 2021 WL 3883875, at *11 n.70 (Del. Ch. Aug. 31, 2021) (citation omitted).
[70] *Larkin*, 2016 WL 4485447, at *12.
[71] *Id.* (citing *In re Volcano Corp. S'holder Litg.*, 2016 WL 3583704, at *11 (Del. Ch. June 30, 2016)).
[72] Compl. ¶ 65.

plead coercion at all),[73] and therefore *Corwin* may be applicable in the event a fully informed, uncoerced vote of the stockholders indeed occurred. I consider this in further detail below.

### 1. Assessing the Merger Proxy and Stockholder Vote Under *Corwin*

To attain the business judgment rule standard of review under *Corwin*, the stockholder vote in question must be fully informed.[74] Here, the Plaintiffs argue that the vote was not fully informed on two bases.[75] Because I find that none of the omitted information was required to be disclosed in the Merger Proxy, I conclude that the stockholder vote was fully informed.

### a. Considering the Materiality of the Omitted Information

The Plaintiffs allege that Cynergy was excluded from Noble's proxy description of the "sales process" such that Noble stockholders lacked "full disclosure of the potential superior offers in the market," and separately allege that Noble stockholders did not fully understand the Amended Plan awarding change in control payments to corporate officers.[76] With respect to the Amended Plan, the Plaintiffs take issue with the fact that the Merger Proxy did not "fully disclose what

---

[73] *See generally* Compl.
[74] *See In re Columbia Pipeline Grp., Inc.*, 2021 WL 772562, at *11 (Del. Ch. Mar. 1, 2021) (citation omitted) ("To defeat *Corwin* cleansing, a plaintiff must plead the existence of a disclosure violation.").
[75] They also aver that these disclosure deficiencies demonstrate breaches of fiduciary duty by the Defendants.
[76] Compl. ¶ 61.

15

role the [Amended] Plan had in negotiations during the sale of" Noble.[77] The

Plaintiffs therefore charge the Defendants with a failure of their "duty of

candor/disclosure" and contest whether the stockholder vote following the Merger

Proxy was fully informed.[78]

It is worth distinguishing the predicate issue before me—the alleged lack of

an informed vote for purposes of applying the *Corwin* analysis—from the closely

related issue of whether the same informational deficit represents an unexculpated

breach of fiduciary duty on the part of the Defendants. The duty to disclose material

information in way of stockholder action inheres in the fiduciary duties of care and

loyalty.[79] Where a corporation seeks stockholder action, directors of Delaware

corporations are responsible for disclosing "fully and fairly all material information

within the board's control."[80] Directors are required to provide stockholders with

"accurate *and complete* information *material* to a transaction or other corporate

event that is being presented to them for action."[81] Violation of fiduciary duties in

way of such disclosures constitutes the Plaintiffs' substantive claim of breach of

fiduciary duty in this matter. Analysis of whether alleged misdisclosures breach

such duties would focus on the knowledge and action of the Defendant directors and

---

[77] *Id.* ¶ 84.
[78] *See id.* ¶¶ 6, 28.
[79] *Malone v. Brincat*, 722 A.2d 5, 11 (Del. 1998).
[80] *Id.* at 9 (quoting *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996)).
[81] *Id.* at 10.

officers. For *Corwin* purposes, by contrast, ratification requires the informed vote of the *stockholders*; as addressed below, the focus is on the knowledge of the transaction communicated to the stockholders, and whether they were sufficiently informed to ratify the transaction. Because, here, I find the stockholders were so informed, the business judgment rule applies and my analysis need not go further.

The Plaintiffs here ask me to find that, without disclosure of both (1) the Cynergy proposal and (2) further details regarding the Amended Plan, Noble stockholders lacked accurate and complete information. In essence, their argument is that the Merger Proxy was incomplete. However, directors need not provide exhaustive information in seeking a stockholder vote; caselaw requires accurate and complete disclosure of *material* information.[82]

In *TSC Industries, Inc. v. Northway, Inc.*, the United States Supreme Court grappled with the appropriate standard for determining whether information is "material," eventually rejecting the standard applied by the lower circuit court of "all facts which a reasonable shareholder [m]ight consider important."[83] The Supreme Court indicated that this threshold was too low: "[s]ome information is of such

---

[82] *See In re Solera Holdings, Inc. S'holder Litig.*, 2017 WL 57839 (Del. Ch. Jan. 5, 2017) (quoting *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000)) ("[I]nformation is 'not material simply because [it] might be helpful.'").

[83] *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976) (citing *Northway, Inc. v. TSC Indus., Inc.*, 512 F.2d 324, 330 (7th Cir. 1975)). The materiality standard expressed in *TSC Industries* has been adopted by Delaware courts. *See, e.g.*, *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 949 (Del. 1985).

dubious significance that insistence on its disclosure may accomplish more harm than good . . . . [M]anagement's fear of exposing itself to substantial liability may cause it simply to bury the shareholders in an avalanche of trivial information[,] a result that is hardly conducive to informed decisionmaking."[84]  Ultimately, the Supreme Court held that "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[85]  In order for information to be material in nature, the information must be "of a magnitude that it would, upon disclosure, have 'significantly altered the "total mix" of information in the marketplace.'"[86]

Delaware cases have further recognized that materiality is, by its nature, a contextual and fact-specific concept,[87] requiring careful consideration of the allegedly material nonpublic information in conjunction with the public knowledge of the market.

While the burden of demonstrating that stockholders were fully informed for purposes of *Corwin* generally lies with the defendants, cases have held that a plaintiff challenging a stockholder vote should "'first identify a deficiency in the operative

---

[84] *Id.* at 448–49.
[85] *Rosenblatt*, 493 A.2d at 949 (citing *TSC Indus.*, 426 U.S. at 449).
[86] *In re Oracle Corp.*, 867 A.2d 904, 934 (Del. Ch. 2004) (quoting *Rosenblatt*, 493 A.2d at 944).
[87] *See Kihm*, 2021 WL 3883875 at *11 (citing *Chester Cty. Emps. Ret. Fund v. KG Holdings, Inc.*, 2019 WL 2564093, at *10 (Del. Ch. June 21, 2019)) (describing the inquiry as "fact-intensive").

disclosure document.'"[88]  Once a deficiency has been identified, the burden falls to the defendants to establish that the alleged deficiency is not material as a matter of law, such that the cleansing effect of the vote may be secured.[89]

With these standards to guide my review, I consider the two omissions the Plaintiffs allege violated the Noble Board's disclosure obligations, while remaining mindful of the broader plaintiff-friendly standard of review to be applied at the motion to dismiss stage.

I begin with the omission of the Cynergy proposal.  The Cynergy proposal was unsolicited, made in mid-2018, and predated important contextual developments, such as the commercialization of the Leviathan field and the onset of the COVID-19 pandemic.[90]  Further, the Cynergy proposal contemplated an entirely different transaction structure than the one achieved in the Merger with Chevron.[91] Additionally, the Cynergy proposal was never entertained by management or the Board.[92]  Even drawing all reasonable inferences in favor of the Plaintiffs, the alleged failure to fully inform stockholders with respect to the Cynergy proposal cannot survive.

---

[88] *Columbia Pipeline*, 2021 WL 772562, at *32 (citation omitted); *see also Kihm*, 2021 WL 3883875, at *11.
[89] *See id.*
[90] *See supra* Section I.A.
[91] *See supra* Section I.A.
[92] *See supra* Section I.A.

19

As a threshold matter, the Plaintiffs correctly point out that the Cynergy proposal need not have remained available to Noble at the time of the Merger Proxy for the information regarding the proposal to have been material. One can readily hypothesize a set of facts where a proposal sufficiently proximate in time and circumstances to the Merger would be material to stockholders, even if no longer available at the time of the Merger Proxy. The actual Cynergy proposal was, as pointed out above, remote in both time and circumstances from the Merger and the Merger Proxy, however. The Cynergy proposal, to be found material, must have been significant enough to alter the "total mix" of information in the marketplace at the time the stockholder vote was solicited. I do not find that it was.

The time lapse between the original Cynergy proposal and the Merger, along with the content of the proposal, are such that a reasonable stockholder would not be substantially likely to consider the slide deck important in voting its shares. The slides excerpted in the Complaint call for the exploration of "the potential of a deal *for a limited initial time period* on a non-exclusive basis," and suggest "negotiat[ing] and *promptly* clos[ing]" the transaction in question,[93] strongly suggesting that the Cynergy proposal would not have survived to 2020. Further, Delaware courts have previously held that it is not "reasonably conceivable that preliminary conversations that occurred over eighteen months before the transaction was agreed to would

---

[93] *See* Compl. ¶ 38.

significantly alter the total mix of information available to [company] stockholders."[94] A similar gap likely exists here, though the exact date of the Cynergy proposal has not been provided.

Additionally, the Cynergy proposal emphasizes the opportunity to "realise an accelerated development and monetisation of the Leviathan and Aphrodite fields"[95]—something that had, at least partially, taken place as of December 31, 2019.[96] Given Cynergy's specific interest in getting in at the ground level with respect to "existing, yet to be fully commercialised assets,"[97] the changed circumstances indicate little relevance between the Cynergy contact and the Merger with Chevron.

Beyond this, any information disclosed about Cynergy would have been minimally relevant at best because of the lack of engagement between the two companies.[98] Prior Delaware caselaw has held that where there was "only an expression of interest in a friendly meeting between firms and the facts did not suggest actual 'merger discussions' or 'negotiations,'" related omitted facts were immaterial.[99] While the Cynergy proposal here may have risen *slightly* above that

---

[94] *Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *14 (Del. Ch. June 30, 2014).
[95] Compl. ¶ 38.
[96] *See supra* note 12 and accompanying text.
[97] Compl. ¶ 38.
[98] *See supra* notes 18–20 and accompanying text.
[99] *See Alessi v. Beracha*, 849 A.2d 939, 946 (Del. Ch. 2004) (citing *Shamrock Holdings, Inc. v. Polaroid Corp.*, 559 A.2d 257, 274–75 (Del. Ch. 1989)).

standard (by submitting a proposal rather than merely requesting a meeting), the lack of interest from Noble prevents the Cynergy proposal from taking on any heightened importance, as there was an utter lack of negotiations. The United States Supreme Court has itself indicated that the materiality of a contingent event (such as a merger, or here, the proposed asset acquisition) "will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity."[100] Given the complete dearth of communications alleged between Noble and Cynergy following "mid-2018," the probability that the event (the original proposal) would occur was low. Given that context, and given the existence of multiple other companies' having demonstrated more recent interest, including Chevron's willingness to enter into a definitive merger agreement, the anticipated magnitude of the Cynergy proposal is diminished such that a reasonable investor would be unlikely to place significance upon its disclosure.

Finally, the occurrence of the COVID-19 pandemic diminished the potential materiality of market conditions and opportunities existing pre-COVID-19. In the context of the stock market's volatility and the general atmosphere of uncertainty

---

[100] *See Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988) (internal quotations omitted) (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968)).

that pervaded in 2020,[101] I find it not reasonably conceivable that a reasonable investor would have considered the unanswered Cynergy proposal in 2018 important in determining how to vote on a stock-for-stock merger with Chevron in 2020. As such, the Cynergy proposal was not material, and the fact that the Merger Proxy did not discuss the Cynergy proposal did not render stockholders uninformed for the purposes of *Corwin* cleansing, and did not violate the Defendants' duties regarding disclosure.

I turn now to the question of the executive change-of-control payments available under the Amended Plan. First, for the sake of completeness, I find it helpful to parse certain of the allegations connected with the Amended Plan in the Complaint. The Plaintiffs have pled that the Merger involved some level of self-dealing, stating that "it appears that [Noble] management acted in their own self-interest in pursuing a sale to Chevron in a manner that allowed them to recoup their losses [associated with the COVID-19 pandemic] and also maintain an ongoing equity interest in the surviving company."[102] Further, the Noble Board enacted the Amended Plan, which the Complaint characterizes as a "substantial windfall to

---

[101] *See, e.g.*, *Williams Cos. S'holder Litig.*, 2021 WL 754593, at *4 (Del. Ch. Feb. 26, 2021) ("In early 2020, however, the COVID-19 pandemic and the ensuing oil price war between Saudi Arabia and Russia shocked the oil market and sent stock prices plummeting."). *Williams* discussed the trading volume in another natural gas company during the beginning stages of the COVID-19 pandemic, characterizing it as "high," "fluctuat[ing] dramatically from day to day," and indicative of "a lot of unusual and short-term-type trading." *See id.* (citations omitted).
[102] Compl. ¶ 52.

Noble Energy Management."[103]  According to the Plaintiffs, these facts "strongly suggest that, while shopping the Company, management engaged in self-dealing while the Board turned a blind eye and, perhaps worse, acquiesced and supported management's misconduct."[104]  As discussed above, while these allegations might give rise to a claim of the duty of loyalty in other circumstances, they do not prevent the application of *Corwin* here,[105] provided disclosure was sufficient to render the (uncoerced) stockholder vote fully informed and therefore curative.

Turning then to the meat of the disclosure claim, the Complaint alleges that the Amended Plan was not disclosed in Noble's 2020 annual proxy statement, and was only included as an attachment sans discussion to the Form 10-Q.[106]  The Complaint also further alleges that

> the proxy [seeking approval of the Merger by stockholders] fails to disclose the changes to the [Amended Plan] . . . .  The Proxy fails to disclose whether this amendment was in due course or that it had been in the works for some time.  The Proxy further fails to fully disclose what role the [Amended] Plan had in negotiations during the sale of [Noble.][107]

---

[103] *Id.* ¶ 57.

[104] *Id.* ¶ 65.

[105] *See supra* notes 72–73 and accompanying text.

[106] Compl. ¶ 56.

[107]*Id.* ¶ 84.  The capitalization of the term "proxy" is inconsistent in the above-quoted section.  The capitalized term "Proxy" as used throughout the Complaint refers to the Merger Proxy, and the stockholder vote stemmed from the Merger Proxy, so I assume that the first reference to the "proxy" also pertains to the Merger Proxy.  *See generally* Compl.

24

The Merger Proxy includes detailed disclosure regarding potential severance payments and benefits in connection with the Amended Plan and Merger.[108] The Merger Proxy also incorporates by reference the Form 10-Q, which had attached the Amended Plan previously.[109] Between these references and the availability of the *actual Amended Plan*, the pertinent information about the Amended Plan was accessible to Noble stockholders.

The Plaintiffs allege that more must have been disclosed. Their reading would require discussion of the changes made to the plan comparative to the 2016 version, the timing of the contemplated changes memorialized in the Amended Plan, and the importance the Amended Plan had with respect to negotiations for sale of Noble.[110] Even viewed in the light most favorable to the Plaintiffs, none of this gives rise to a disclosure violation.

First, it is not necessary that the Merger Proxy (or the annual proxy) summarize in detail every change made to the Amended Plan. Rather, the Merger Proxy's comprehensive information regarding the payments named executive officers could expect to receive provides stockholders with the expected outcome,

---

[108] *See* Merger Proxy 83–85.
[109] Although not pled or argued by either party here, in addition to the Form 10-Q, I note that the Merger Proxy also incorporated by reference a Form 8-K filed by Noble with the Securities and Exchange Commission on May 1, 2020, which discusses the Amended Plan. *See id.* at 145; *but see In re Pattern Energy Grp. Inc. S'holders Litig.*, 2021 WL 1812674 (Del. Ch. May 6, 2021) (finding that references in multiple prior Form 10-Ks were insufficient to provide full disclosure).
[110] *See supra* note 106 and accompanying text.

which is the pertinent information.  Again, *the precise benefits of the plan flowing to named executive officers, should the Merger be approved, were explicitly disclosed to stockholders*.  Thus, not only was the text of the Amended Plan itself provided, but the expected effects were also clearly delineated to stockholders.  "[M]ere failure to organize the documents to meet [the] plaintiff's best case scenario for maximizing the clarity of the information presented does not constitute the kind of omission or misleading half truth necessary for a materially inadequate disclosure."[111]  The disclosure regarding the changes to the Amended Plan, and the ultimate payouts in connection with the same, was sufficient here.[112]

I note that the Amended Plan itself had already been enacted by the Board, as the Merger Proxy and the Form 10-Q disclosed.  The information for which Plaintiffs advocate—the timeline for contemplation of changes ultimately enshrined in the Amended Plan—would not significantly alter the "total mix" of information for stockholders in determining whether to vote *for the Merger with Chevron*, in light of that disclosed fact.  That is, even if the Noble stockholders chose to reject the

---

[111] *Salladay v. Lev*, 2020 WL 954032, at *16 (Del. Ch. Feb. 27, 2020) (internal quotations omitted) (quoting *Wolf v. Assaf*, 1998 WL 326662, at *3 (Del. Ch. June 16, 1998)); *see also Wolf*, 1998 WL 326662, at *3 ("Under no reasonable interpretation of the facts plead [sic] could the placement of the disclosure about the [allegedly omitted information] in the 10-K accompanying the proxy statement rather than in the statement itself serve as the basis for a disclosure violation.").

[112] *Cf. In re Trans World Airlines, Inc. S'holders Litig.*, 1988 WL 111271, at *10 (Del. Ch. Oct. 21, 1988) (indicating that if the numbers in question could be derived from information in the proxy statement, that disclosure might be acceptable), *abrogated on other grounds by Kahn v. Lynch Commc'n Sys., Inc.,* 638 A.2d 1110 (Del. 1994).  As above, the numbers here were not merely derivable but were explicitly provided in the Merger Proxy.

Merger with Chevron, the substance of the Amended Plan would have remained in effect and would have applied to any change-of-control transaction contemplated in the future.[113] In my view, the only facts pertaining to the Amended Plan that were material were the dollar-value payments to be made to the applicable members of management, which the Plaintiffs have conceded were included in the Merger Proxy.[114] The incentives for management associated with those payments were apparent.[115] The dates on which the Amended Plan was considered would not, to my mind, change the "total mix" of information available to the reasonable stockholder.

\* \* \*

The Complaint pleads that the Noble stockholders' vote was less than fully informed due to lack of disclosure regarding the Cynergy proposal as well as the

---

[113] *Cf. Solera*, 2017 WL 57839, at *12. *Solera* involved, among other things, a disclosure claim regarding a "Special Cash Award" paid out in connection with the Merger. *See id.* The Court indicated that the Special Cash Award "logically had no impact on who the company was sold to because it had been paid and the money was out the door before final bids were submitted and the Merger Agreement was signed." *Id.* While the change-of-control payments had not been made before signing in this case, the *Solera* reasoning inures, at least in part, here as well. Regardless of the identity of the suitor purchasing Noble, the Amended Plan was in effect and would have applied to any change-of-control transaction. This much was apparent to stockholders.

[114] *See* AB 35 ("The Complaint, however, does not allege the [Merger] Proxy failed to disclose the change-in-control payments . . . .").

[115] "When a proxy statement describes the facts that create differing incentives for fiduciaries, it need not explain how those differing incentives could produce a self-interested outcome." *Columbia Pipeline*, 2017 WL 898382, at *3 (citing *Solera*, 2017 WL 57839, at *11–12; then citing *Orman v. Cullman*, 794 A.2d 5, 34–35 (Del. Ch. 2002)). The differing incentives for the named executive officers were made evident in the Merger Proxy. Noble need not provide further information regarding the "role," if any, that the Amended Plan played in the signing of the Merger.

27

executive change-of-control payments per the Amended Plan. I have found above that it is not reasonably conceivable that either of these two items were material such that they needed to be disclosed to stockholders, and the Plaintiffs plead no other basis which might find the stockholder vote to have been less than fully informed. The Plaintiffs also do not plead coercion of the Noble stockholders.[116] I find that *Corwin* applies.

### b. The Results of the Application of *Corwin*

Given that *Corwin* applies to the Merger, the business judgment rule is the appropriate standard of review[117] for assessing the transaction.[118] It follows that the only kind of claim that can survive the cleansing effect of the stockholder vote is a claim of waste.[119] The Plaintiffs do not plead waste.[120] Count I, which alleges a general breach of fiduciary duty against the Noble Board, must therefore fail, as does Count II (alleging breach of duty regarding disclosures by the Defendants, discussed at length above) and Count III, alleging a breach of the duty of care against Defendant Stover.

---

[116] *See generally* Compl.
[117] Or standard of non-review.
[118] *Kihm*, 2021 WL 3883875, at *10.
[119] *See id.*
[120] *See generally* Compl.

## III. CONCLUSION

The Defendants' Motion to Dismiss is GRANTED.  An appropriate Order is attached.

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STEPHANIE GALINDO and DAVID WALSH, Individually and For All Others Similarly Situated, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 2021-0031-SG |
| DAVID L. STOVER, JEFFREY L. BERENSON, JAMES E. CRADDOCK, BARBARA J. DUGANIER, THOMAS J. EDELMAN, HOLLI C. LADHANI, SCOTT D. URBAN, WILLIAM T. VAN KLEEF, and MARTHA B. WYRSCH, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

WHEREAS, Defendants David L. Stover, Jeffrey L. Berenson, James E. Craddock, Barbara J. Duganier, Thomas J. Edelman, Holli C. Ladhani, Scott D. Urban, William T. Van Kleef, and Martha B. Wyrsch ("Defendants"), having moved this Court for an order dismissing the Verified Class Action Complaint (the "Complaint") in the above-captioned action,

IT IS HEREBY ORDERED, this 26th day of January, 2022, that:

1. Defendants' motion is GRANTED; and

2. The Complaint is DISMISSED WITH PREJUDICE.

_____
Vice Chancellor Sam Glasscock III